**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James CABACCANG, Defendant–
Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Richard T. Cabaccang, Defendant–
Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Roy Toves Cabaccang, Defendant–
Appellant.**

Nos. 98–10159, 98–10195, 98–10203.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted En
Banc Dec. 9, 2002.

Filed June 6, 2003.

Rory K. Little, San Francisco, California, for the defendants-appellants Cabaccang.

Elizabeth A. Fisher, Honolulu, Hawaii, for the defendant-appellant James Cabaccang.

Arthur E. Ross, Honolulu, Hawaii, for the defendant-appellant Richard T. Cabaccang.

Sarah Courageous, Honolulu, Hawaii, for the defendant-appellant Roy Toves Cabaccang.

Kathleen A. Felton, Assistant United States Attorney, Washington, D.C., for the plaintiff-appellee.

Before SCHROEDER, Chief Judge, KOZINSKI, O'SCANNLAIN, KLEINFELD, HAWKINS, GRABER, McKEOWN, W. FLETCHER, FISHER, PAEZ and TALLMAN, Circuit Judges.

Opinion by Judge FISHER; Concurrence by Chief Judge SCHROEDER; Dissent by Judge KOZINSKI

## OPINION

FISHER, Circuit Judge:

Appellants James, Richard and Roy Cabaccang appeal their convictions on a variety of charges relating to their involvement in a drug trafficking ring that transported large quantities of methamphetamine from California to Guam in the early and mid–1990s. The Cabaccangs' primary contention on appeal is that the transport of drugs on a nonstop flight from one location within the United States to another does not constitute importation within the meaning of 21 U.S.C. § 952(a), even though the flight traveled through international airspace. We agree, and therefore we reverse the appellants' convictions on all importation-related counts.

### Factual and Procedural Background

In the early 1990s, Roy Cabaccang began selling methamphetamine out of his house in Long Beach, California, to customers introduced to him by his younger brothers Richard and James. The Cabaccangs eventually expanded their operation to include large-scale shipments of methamphetamine to Guam for local distribution. To transport the drugs to Guam, Roy recruited various people to fly from Los Angeles to Guam with packages of

methamphetamine concealed under their clothing. Richard helped the couriers tape the packages of methamphetamine to their bodies. The Cabaccangs also sent packages of methamphetamine from California to Guam through the United States mail. After Roy's associates sold the methamphetamine in Guam, they sent the proceeds back to California via courier and wire transfer. Each of the Cabaccang brothers received wire transfers of profits from the drug sales.

After a long investigation, the Cabaccangs were indicted in 1997 on numerous charges relating to their involvement in the methamphetamine ring. A jury convicted all three brothers of conspiracy to import methamphetamine, in violation of 21 U.S.C. §§ 952(a), 960 and 963; conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956.[1] The district court sentenced all three brothers to concurrent terms of life in prison on at least one of the importation counts and at least one of the non-importation counts (with concurrent shorter terms on other counts).[2]

The Cabaccangs appealed their convictions to this court, claiming that the transport of drugs from California to Guam does not constitute importation merely because the drugs traveled through international airspace en route to Guam.[3] Relying on our decisions in *Guam v. Sugiyama,* 846 F.2d 570 (9th Cir.1988) (per curiam), and *United States v. Perez,* 776 F.2d 797 (9th Cir.1985), a three-judge panel affirmed the convictions in an unpublished disposition, stating that "we have clearly declared that transporting drugs from one point in the United States to another through or over international waters constitutes importation."[4] *United States v. Cabaccang,* 16 Fed. Appx. 566, 568, 2001 WL 760553 (9th Cir.2001) ("*Cabaccang I*"). We granted rehearing en banc to reexamine the importation statute and determine whether it does prohibit the transport of drugs through international airspace on a nonstop flight from one point within the United States to another.

## Standard of Review

■ The construction or interpretation of a statute is a question of law that we

---

**1.** Richard and Roy were also convicted of importation of methamphetamine, and Roy was convicted of conducting a continuing criminal enterprise, possession of methamphetamine with intent to distribute, attempted importation of methamphetamine and possession and receipt of a firearm by a convicted felon.

**2.** Roy received concurrent life sentences on all of the drug counts. James received concurrent life sentences on the counts of conspiracy to import and conspiracy to distribute. Richard received concurrent life sentences on the counts of conspiracy to import, conspiracy to distribute and conspiracy to launder money.

**3.** The Cabaccangs asserted numerous other grounds for reversal of their convictions, including insufficient evidence, constructive amendment of the indictment, multiplicitous

counts, ineffective assistance of counsel, erroneous jury instructions and erroneous denial of Roy's motion to suppress evidence. The brothers also claimed that their sentences violated the rule announced in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because drug quantity was not charged in the indictment or submitted to the jury.

**4.** The panel also rejected the Cabaccangs' other challenges to their convictions, *see United States v. Cabaccang,* 16 Fed. Appx. 566, 568–70, 2001 WL 760553 (9th Cir.2001), and it denied the Cabaccangs' *Apprendi*-based challenges to their sentences in a subsequent memorandum disposition. *See United States v. Cabaccang,* 36 Fed. Appx. 234, 2002 WL 1192886 (9th Cir.2002) ("*Cabaccang II*").

review de novo. *United States v. Carranza*, 289 F.3d 634, 642 (9th Cir.), *cert. denied,* —— U.S. ——, 123 S.Ct. 572, 154 L.Ed.2d 458 (2002).

## Discussion

### I.

■ "We interpret a federal statute by ascertaining the intent of Congress and by giving effect to its legislative will." *Bedroc Ltd. v. United States,* 314 F.3d 1080, 1083 (9th Cir.2002) (internal quotation marks omitted). The starting point of this inquiry is the language of the statute itself. *United States v. Hackett,* 311 F.3d 989, 991 (9th Cir.2002). Section 952(a) states that "[i]t shall be unlawful[1] to import into the customs territory of the United States from any place outside thereof (but within the United States), or [2] to import into the United States *from any place outside thereof,* any controlled substance." 21 U.S.C. § 952 (emphasis added). Section 951(a), which furnishes the relevant definitions for the terms used in § 952, defines "import" broadly as "any bringing in or introduction of such article into any area (whether or not such bringing in or introduction constitutes an importation within the meaning of the tariff laws of the United States)." *Id.* § 951(a)(1). It is the second clause of § 952(a) that is at issue here, as it is undisputed that the Cabac-

cangs did not bring drugs into the customs territory of the United States.[5]

The Cabaccangs argue that they are not guilty of importation because they did not bring drugs into the United States from a "place outside thereof." They contend that the transit of drugs through international airspace en route from one location in the United States (California) to another (Guam) is insufficient to support a charge of importation under § 952.[6] The government counters that international airspace is itself a "place outside" the United States within the meaning of the statute. Pointing to § 951's definition of "import" as "any bringing in," the government argues that the entry of contraband into the United States from international airspace is all that the statute requires. That the flight carrying the contraband departed from a domestic location is irrelevant, the government maintains, because § 952(a) is unconcerned with the origin of a shipment of drugs that enters the United States from international airspace.

The problem with the government's argument is that despite § 951's broad definition of importation as "any bringing in," section 952(a) itself specifies that the bringing in be *"from any place outside"* the United States. (Emphasis added.) This requirement was not an element of § 952(a)'s predecessor statute, 21 U.S.C. § 174, which provided criminal penalties for "fraudulently or knowingly import[ing]

---

5. The Cabaccangs brought drugs into Guam, which is not part of the customs territory of the United States. *See* Harmonized Tariff Schedule of the United States ("HTSUS"), General Note 2, 19 U.S.C. § 1202 (defining the customs territory of the United States as "the States, the District of Columbia and Puerto Rico"), *available at* http://dataweb.usitc.gov/SCRIPTS/ tariff/toc.html.

6. The airspace of the United States currently includes that airspace overlying the waters within 12 nautical miles of the land borders of the United States. *See* Proclamation No.

5928, 54 Fed.Reg. 777 (Dec. 27, 1988) (extending the territorial sea of the United States to 12 nautical miles from the baselines of the United States, and defining the territorial sea of the United States as "maritime zone extending beyond the land territory and internal waters of the United States over which the United States exercises sovereignty and jurisdiction, *a sovereignty and jurisdiction that extend to the airspace over the territorial sea,* as well as to its bed and subsoil." (emphasis added)).

or bring[ing] any narcotic drug *into the United States* or any territory under its control or jurisdiction, contrary to law." (Emphasis added.)[7] In 1970, Congress replaced § 174 with § 952, inserting the phrase "from any place outside thereof" after the words "into the United States" without explanation.[8] If, as the government urges, Congress was concerned only with the destination of the drugs, it would have been sufficient to retain the original language of the importation statute, simply prohibiting the import of drugs *"into* the United States" without reference to the point of origin. The addition of the phrase *"from* any place outside the United States" undercuts the government's contention that Congress intended the origin of a drug shipment to be irrelevant to a finding of importation under § 952(a). *See Webster's Third New International Dictionary* 913 (1981) (defining "from" as "used as a function word to indicate a starting point: as (1) a point or place where an actual physical movement ... has its beginning ..."); *The American Heritage Dictionary of the English Language* 729 (3rd ed.1996) (defining "from" as "[u]sed to indicate a specified place or time as a starting point: walked home from the station ...").

The question, then, is whether drugs that pass through international airspace on a nonstop flight en route from one U.S. location to another, without touching down on either land or water, are "from" a "place outside" the United States for the purposes of § 952(a). When Congress has not provided special definitions, we must construe words in a statute "according to their ordinary, contemporary, common meaning[s]." *Hackett,* 311 F.3d at 992 (alteration in original) (internal quotation

marks and citation omitted). Turning to the word "place," we acknowledge that it can have many meanings, some of which, when viewed in isolation, might seem to apply to international airspace. The critical question, however, is what the term reasonably can be understood to encompass as it is used, not in isolation, but in the phrase "from any place outside [the United States]," and in the larger context of § 952, which is concerned with the importation of drugs into the United States.

In the ordinary sense of the term, drugs do not come from international airspace, although they certainly can move through that space. Unlike, for example, a foreign nation—which is unquestionably a "place outside" the United States—international airspace is neither a point of origin nor a destination of a drug shipment; it is merely something through which an aircraft must pass on its way from one location to another. We do not treat passengers who travel through international airspace on a nonstop flight between two U.S. locations as having crossed our borders (i.e., as having entered the United States from a place outside thereof), and thereby subject to immigration inspections or border searches—as they would be if the flight had originated in a foreign country. *Cf. United States v. Garcia,* 672 F.2d 1349, 1357–58 (11th Cir.1982) (doubting the validity of a border search of an airplane that traveled through international airspace en route between known points of origin and destination within the United States, because "there is no more justification for searching the aircraft or passengers who make such flights than there would be for searching those whose domestic flights do

7. Section 174 traced its origins to 35 Stat. 614 (1909), which prohibited the importation of opium into the United States. The statute was amended in 1922 to extend the prohibi-

tion to the importation of "any narcotic drug." 21 U.S.C. § 174 (1922).

8. The legislative history is silent as to why Congress made this change.

not happen to take them over the ocean on the way"). Moreover, were we to ask anyone familiar with the facts of this case from what place the Cabaccangs brought drugs into Guam, the answer surely would be "California"—not "international airspace." *See United States v. Ramirez–Ferrer*, 82 F.3d 1131, 1137 (1st Cir.1996) (en banc) (using the same reasoning in concluding that the term "place," as it is used in § 952(a), does not include in-transit international waters).

The dissent rejects this analysis of the plain meaning of the statutory language, arguing that an item in transit is *from* all of the places *through* which it passes en route from its starting point to its destination. We recognize that, like the word "place," the word "from" can have different meanings, depending on the context of the inquiry. We think it is clear, however, that a defendant who has brought drugs on a non-stop flight that lands in the United States can most reasonably be said to have brought drugs *from* the point of the flight's departure—and not the airspace *through* which the plane traveled on the way.[9]

Although we conclude that a common-sense reading of the plain language of the statute forecloses its application here, we are also persuaded that our reading is consistent with the statute's structure. "[W]e must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir.1991). Under the government's interpretation of the statute, however, any conduct proscribed by the first clause of § 952(a) also would have been covered by the statute's broader second clause when § 952 was enacted in 1970, rendering the first clause of the statute superfluous.

The first clause of § 952(a) prohibits the importation of drugs "into the customs territory of the United States from any place outside thereof (but within the United States)." 21 U.S.C. § 952(a). The customs territory of the United States consists of "the States, the District of Columbia and Puerto Rico." *See* HTSUS at General Note 2. At the time of § 952's enactment, when the territorial sea of the United States extended only three miles out from the coast,[10] all of the U.S. territories that were outside the customs territory, e.g., the U.S. Virgin Islands, Guam and American Samoa, were not contiguous with the customs territory. It therefore would have been impossible to bring drugs from the noncustoms territory into the customs territory without passing through international airspace (or waters).[11] Under the government's reading of the statute, however, the entry of drugs into the United States from international airspace already would have been

---

**9.** The dissent posits that "[a] person traveling from Place A *to* Place B to Place C arrives at C both *from* A and *from* B." (Italics added.) We find such a reading to be strained and implausible in the context of a nonstop flight. The flights at issue in this case, for example, undeniably flew from Los Angeles ("Place A") *to* Guam ("Place C"), but *not* "*to*" international airspace ("Place B," per the dissent).

**10.** *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 n. 8, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) ("The Unit-

ed States has [until 1988] adhered to a territorial sea of 3 nautical miles....").

**11.** As the dissent notes, this is not entirely the case today: given the current 12–mile limit of the territorial sea, it is possible to travel from St. Thomas (noncustoms territory) to Puerto Rico without leaving United States airspace or waters, as the tiny island of Culebra, Puerto Rico (but not the main island of Puerto Rico) is within 24 miles of St. Thomas.

prohibited by the second clause of the statute. Therefore, any importation proscribed by the first clause also would have been proscribed by the second clause, rendering the first clause superfluous. We cannot conclude that Congress intended the opening clause of the statute to have no independent force. *See Am. Vantage Cos. v. Table Mountain Rancheria,* 292 F.3d 1091, 1098 (9th Cir.2002) ("It is a well-established principle of statutory construction that legislative enactments should not be construed to render their provisions mere surplusage." (internal quotation marks omitted)).

In an attempt to save its interpretation of § 952(a) from superfluousness at the time of the statute's enactment, the dissent argues that Congress did not intend the three-mile limit of the territorial sea to be the relevant boundary. According to the dissent, when Congress defined the "United States" for the purposes of § 952 as "all places and waters, continental or insular, subject to the jurisdiction of the United States," *see* 21 U.S.C. § 802(28), *incorporated by* § 951(b), it *could have meant* "waters ... subject to the jurisdiction of the United States" to refer to the limited 12–mile customs interdiction jurisdiction codified at 19 U.S.C. §§ 1401(j), 1581(a)-(b), rather than the three-mile limit of plenary sovereign jurisdiction within the territorial sea.[12]

It is not enough, however, that Congress "reasonably could have believed" that § 952 invoked this 12 mile limited interdiction jurisdiction, rather than the three-mile sovereign jurisdiction. Our role is to determine Congress' actual intent, not its possible intent, and the Supreme Court

has instructed that in the absence of a clear statement, we should not assume that Congress intended to include the waters beyond the territorial sea when defining the United States. *See Argentine Republic,* 488 U.S. at 440, 109 S.Ct. 683. In *Argentine Republic,* the respondents argued that under the Foreign Sovereign Immunities Act—which defined the "United States" as all "territory and waters, continental and insular, subject to the jurisdiction of the United States"—the term "waters ... subject to the jurisdiction of the United States" included the high seas, which are within the admiralty jurisdiction of the United States.[13] *Id.* (citing 28 U.S.C. § 1603(c)). The Supreme Court rejected this attempt to broaden the statute's definition of the United States, holding that

the term "waters" in § 1603(c) cannot reasonably be read to cover all waters over which the United States courts *might* exercise jurisdiction. When it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute. We thus apply "[t]he canon of construction which teaches that legislation of Congress, unless contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."

*Id.* (emphasis added) (footnote omitted) (quoting *Foley Bros. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)). Because there was no evidence of congressional intent to include the high seas within the definition of the United States, the Court held that the incident at issue did not occur within the United States, be-

---

**12.** This limited customs jurisdiction is also referred to as the "contiguous zone." *See United States v. Rubies,* 612 F.2d 397, 403 n. 2 (9th Cir.1979); *see also* Convention on the Territorial Sea and the Contiguous Zone, art. 24, 15 U.S.T. 1606 (1964).

**13.** The high seas are those waters that are seaward of the territorial sea, and they include the contiguous zone. *Rubies,* 612 F.2d at 403 n. 2.

cause it occurred "outside the 3 mile limit then in effect for the territorial waters of the United States." *Id.* at 441, 109 S.Ct. 683.

Evidence of congressional intent to incorporate the limited jurisdiction of the contiguous zone, rather than the plenary sovereign jurisdiction of the territorial sea, is similarly lacking here. The dissent points to nothing in the statutory language or the legislative history of § 952 to indicate that Congress intended to include the contiguous zone in its definition of the United States. Instead, it relies on the decisions of three circuits that have assumed that § 952 incorporated the 12 mile limit of the contiguous zone. *See United States v. Nueva,* 979 F.2d 880, 884 (1st Cir.1992); *United States v. Goggin,* 853 F.2d 843, 845 (11th Cir.1988); *United States v. Lueck,* 678 F.2d 895, 905 (11th Cir.1982); *United States v. Seni,* 662 F.2d 277, 286 (4th Cir.1981). But none of these decisions addressed whether that interpretation properly construed Congress' intent to invoke a definition different from the three-mile territorial limit in effect when the statute was enacted. In the absence of some indication that Congress actually intended to include the contiguous zone within its definition of the United States for purposes of § 952, we follow the Supreme Court's interpretive mandate in *Argentine Republic* and conclude instead that Congress intended the operative boundary of the United States to be the three-mile limit that defined the U.S. territorial sea in 1970, until it was extended in 1988. Under this limit, it would have been impossible to travel from the noncustoms territory of the United States to the customs territory without passing through international airspace. Clause 1 of § 952(a) thus would have been superfluous if, as the government contends, clause 2 prohibited the transport of drugs through international airspace on a domestic flight. We decline,

as we must, to attribute to Congress an intent to create such a redundancy.

Moreover, even if we were to accept the dissent's contention that Congress intended to invoke the 12 mile limit, and thus that it would have been possible in 1970, as it is today, to violate clause 1 (and not clause 2) by transporting drugs from St. Thomas to Puerto Rico, we still would be hard pressed to find a plausible legislative purpose for clause 1. Under the government's interpretation of the second clause of § 952(a), the *only* conduct that clause 1 would prohibit that would not be prohibited by clause 2, even under the broader 12 mile limit, is the drug trade from the Virgin Islands to Puerto Rico. This lone point of contiguity between the customs territory and the noncustoms territory exists only by virtue of the location of tiny islands that are so obscure that even the First Circuit—the very Court of Appeals that has jurisdiction over Puerto Rico—is seemingly unaware of them. *See Ramirez–Ferrer,* 82 F.3d at 1138 (stating that "there is no 'place' just outside of the jurisdictional limits of the customs territory of the United States, that is also within the United States. Any place that is just outside the customs territory ... is international waters"). So too, apparently, is the government, which has not thought to invoke the Culebra St. Thomas aberration in support of its construction of the statute. That the government still has not managed to appreciate the relevant geographic nuances only serves to underscore the improbability that Congress was aware of them, let alone motivated by them, as the dissent would have us believe.

Perhaps recognizing the unlikelihood of this scenario, the dissent offers an alternative explanation for the inclusion of clause 1: Congress was aware that the boundaries of the customs territory and the noncustoms territory might change

over time, so it "drafted a generic statute that would cover future contingencies." We are unwilling to speculate, however, that Congress included a statutory provision that was inoperative or nearly so at the time of its enactment just in case there might one day be a need for it.[14] Although we recognize that Congress may legislate with an eye towards the future, we hesitate to make the unsupported inference that Congress intended clause 1 to have little, if any, current application at the time of its enactment, and only speculative future application, as would be the case if the second clause of § 952(a) prohibited the domestic transport of drugs through international airspace. Instead, we consider it far more likely that Congress elected to use the first clause of § 952(a) specifically to target the transport of drugs from the noncustoms territory into the customs territory *precisely because* it believed that such transport was not proscribed by the statute's second clause.

Indeed, Congress' use of the more specific, limited language of clause 1 presents yet another hurdle for the government's interpretation of § 952(a): clause 1 prohibits only the transport of drugs *from* the noncustoms territory *to* the customs territory—it does not address the drug trade in the reverse direction. Thus in 1970 when Congress crafted § 952(a), it made a deliberate choice not to make the first clause reciprocal—banning the importation of drugs from, for example, Guam to California but not from California to Guam. (That one-way ban remains true whether the territorial limit is three or 12 miles.) Under the interpretive maxim of *expressio unius est exclusio alterius*, we "read the enumeration of one case to exclude anoth-

er [if] it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, ——, 123 S.Ct. 748, 760, 154 L.Ed.2d 653 (2003). That Congress chose to single out only the transport of drugs from the noncustoms territory to the customs territory rather than the transport *between* the two territories is a strong indication that Congress did not intend § 952(a) to address "importation" in the opposite (i.e., "outbound") direction. We are thus justified in inferring that "items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart*, 537 U.S. 149, 123 S.Ct. at 760.

It is no answer to suggest that Congress considered it unnecessary to address the drug trade from the customs territory to the noncustoms territory (e.g., California to Guam) because it intended clause 2 to cover such conduct through the concept of "coming from" international airspace. Under that theory, once again clause 1 would be redundant because clause 2 would have sufficed to reach the very conduct clause 1 was carefully drafted to proscribe. If it is necessary for a drug shipment to travel through international airspace to get from a customs territory to a noncustoms territory, then it is also necessary for that shipment to travel through international airspace to go in the reverse direction, and clause 2 would apply to both trips. Moreover, even if we indulge the dissent's assumption that Congress was legislating to cover drug shipments between St. Thomas and Puerto Rico, under any interpretation of the statute the transport of drugs from Puerto Rico to St. Thomas is not punishable as importation. This reinforces our

---

14. Of course, such a need has not yet materialized. Despite the post 1970 changes in the composition of our noncustoms territory and the limits of our territorial sea that the dissent catalogues in bringing us up to date, there still remains only one point of contiguity between the customs territory and the noncustoms territory: Puerto Rico and St. Thomas.

conclusion that in drafting and structuring § 952(a), Congress was not extending its concept of importation into the United States to drug shipments from customs territories to noncustoms territories.

Finally, we reject the government's interpretation of § 952(a) because it would sweep within the ambit of the statute a wide range of conduct that cannot reasonably be characterized as importation. Whenever possible, "we interpret statutes so as to preclude absurd results." *Andreiu v. Ashcroft*, 253 F.3d 477, 482 (9th Cir.2001) (en banc) (citing *United States v. Wilson*, 503 U.S. 329, 334, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992)). Under the government's broad reading of § 952(a), the transport of drugs on a flight from any U.S. city to another would be punishable as importation so long as the flight passed through international airspace, no matter how briefly. A quick glance at a map of the United States reveals the large number of routes that would be implicated by this reading of the statute. In addition to the obvious example of flights between the 48 contiguous states and Alaska or Hawaii, planes routinely fly through international airspace when they travel from Miami to Baltimore, Tampa to Houston and New York to Detroit, to list only a few examples. The transport of drugs on these indisputably domestic flights can only be characterized as domestic conduct—for which rather steep penalties are already available—rather than importation.

Here in the Ninth Circuit we may encounter even more absurd results under the government's interpretation of § 952(a). For example, dozens of commercial flights (to say nothing of noncommercial flights) travel daily up and down the California coast between San Francisco and Los Angeles, and between Los Angeles and San Diego. Given the configuration of the coastline, any one of these flights may travel through international airspace off the coast, perhaps entering and reentering United States airspace several times. Yet nothing on the face of § 952(a) even suggests that Congress intended the transport of drugs on one of these 45 minute intrastate flights to constitute importation within the meaning of the statute.[15]

Moreover, we are unable to conceive of an articulable legislative purpose for punishing the transport of drugs on a domestic flight that passes through international airspace more severely than the identical conduct on a flight that travels entirely within United States airspace. Consider the following example: Under the government's interpretation of § 952(a), a passenger who carries a bag of marijuana on a flight from Portland to Anchorage has committed the crime of importation, while a drug-carrying traveler who departs from the same terminal at the Portland airport is guilty only of mere possession (or perhaps possession with intent to distribute) if his flight lands in Phoenix rather than Anchorage. But what, exactly, is the additional evil committed by the Alaska-bound traveler? The government does not tell us, and we cannot imagine, why Congress would have wanted to penalize the first traveler more heavily.[16] Our inability to

---

**15.** That the government has refrained, so far as we are aware, from charging the transport of drugs on one of these flights as importation does not affect our analysis. Unlike the dissent, we are unwilling to rely on prosecutorial discretion for assurance that indisputably domestic conduct will not be charged under § 952.

**16.** We recognize, as the dissent notes, that both of our hypothetical travelers have engaged in conduct that is not "otherwise innocent" and that may well be "incredibly stupid." However, neither of these observations is relevant to the question of whether the conduct violated § 952(a).

identify a purpose for differentiating between these two cases of domestic transport leads us to conclude that § 952(a) was not intended to draw such distinctions. Indeed, with the specific exception of the conduct proscribed by the first clause of the statute, it was not intended to reach domestic conduct at all.

## II.

We find support for our interpretation of § 952(a) in the First Circuit's decision in *Ramirez–Ferrer*, the only Court of Appeals opinion to analyze the statute's text and history with respect to the question at issue here. *United States v. Ramirez–Ferrer*, 82 F.3d 1131, 1137 (1st Cir.1996) (en banc). The defendants in *Ramirez–Ferrer* were convicted of importation under § 952(a) for transporting cocaine from Mona Island, Puerto Rico to the main island of Puerto Rico.[17] In a decision whose reasoning is similar to our own in this case, the First Circuit reversed the convictions, holding that "transport from one part of the United States to another does not rise to the level of importation simply by involving travel through international waters." *Id.* at 1136.

Looking first to the statutory text, the First Circuit reached the same conclusions as we do regarding the plain meaning of the phrase "from any place [outside the United States]," including the redundancy between the two clauses that would result

from the government's construction of the statute. *Id.* at 1137–38.[18] The court also was influenced by the historical application of the statute, noting that § 952(a) had not been used at all in the manner advocated by the government. *Id.* at 1143. The court interpreted this inaction as a "tacit recognition that such acts [of domestic transport of drugs cannot] reasonably be considered 'importation' within § 952(a)." *Id.* at 1141.

Finally, the First Circuit considered the future implications of the government's interpretation of the statute. The court reasoned, for example, that under the government's reading of the statute, a sailboat tacking up the coast would commit a separate act of importation every time it entered international waters and then reentered domestic territory. *Id.* at 1142. The court further observed that under a logical extension of the government's reading of the importation statute, the act of leaving domestic territory and entering international waters would have to be considered an illegal exportation under § 952(a)'s companion statute, 21 U.S.C. § 953(a), "even though there was no intention or act of visiting a foreign territory or off-loading the exported contraband onto a vessel in international waters." *Id.* Finding these scenarios unreasonable, the First Circuit emphatically rejected the government's effort to transform the domestic

17. Mona Island is located 39 miles off the coast of the main island of Puerto Rico. *See id.* at 1132–33.

18. The court also rejected the government's reading because it concluded that it would make clause 1 impossible to violate. The First Circuit explained that under the government's reading of the statute, "the phrase 'any place outside thereof' essentially means the point at which the drugs were located immediately before passing into the United States (i.e., the international space just outside the

jurisdictional limit of the United States)." *Id.* at 1138. The court reasoned that such a reading would make the statute impossible to violate because "there is no 'place' just outside of the jurisdictional limits of the customs territory of the United States, that is also within the United States. Any place that is just outside the customs territory ... is international waters." *Id.* As we noted earlier, the First Circuit apparently was unaware of the proximity of Culebra, Puerto Rico to the U.S. Virgin Islands.

transport of drugs into importation under § 952(a).[19] *Id.* at 1143.

In an effort to discredit the *Ramirez* opinion, the government treats it as an outlier that conflicts with the great weight of authority on the reach of § 952(a). As the First Circuit recognized, however, the cases on which the government now relies are inapposite, as they do not directly address the factual scenario presented here: a case where the government's own evidence shows that the drugs at issue were transported from one point within the United States to another. Nor do these decisions carefully analyze the language of § 952 or the implications of their broad reading of the statute.

The government directs our attention to *United States v. Peabody*, 626 F.2d 1300, 1301 (5th Cir.1980), in which the Fifth Circuit affirmed the importation convictions of defendants who were apprehended with narcotics 35 miles off the coast of Florida. With no reference to the language of § 952(a), the court rejected the defendants' claim of insufficient evidence of intent to import. The court noted that the defendants were arrested outside the United States, on their way into the country, and simply stated that "[h]ad their cargo of contraband originated in, say, Texas, that would not alter the fact that it was meant to re-enter the United States from international waters. That is enough."[20] *Id.* In stark contrast to this case, however, there was no evidence that the boat on which the *Peabody* defendants were arrested was heading into the United States *from another domestic location.* The court's statement about the hypothetical origin of the cargo is therefore dictum at best. Moreover, the court did not even cite § 952(a), let alone analyze it. As the First Circuit aptly remarked, *"Peabody* and its progeny constitute flimsy precedent upon which to hang one's hat." *Ramirez–Ferrer*, 82 F.3d at 1140.

The government also cites *United States v. Phillips*, 664 F.2d 971, 1033 (5th Cir. 1981), in which the Fifth Circuit held that proof of importation from a place outside the United States may be established by circumstantial evidence, including "evidence that a boat from which marijuana was unloaded went outside United States territorial waters or met with any other

**19.** The error in the government's interpretation of § 952(a) is even more apparent in this case, which deals with the domestic transport of drugs through international airspace rather than international waters. Contrary to the dissent's assertion, the distinction between air and water transport of drugs is hardly arbitrary. It is possible for a ship to pick up foreign passengers or cargo while passing through international waters, whereas the same cannot be said of a nonstop flight between two domestic locations. When a nonstop domestic flight lands at its destination, we know for certain that any drugs on board were there when the plane departed and could not have been acquired from a foreign aircraft. *Cf. Garcia,* 672 F.2d at 1358 (noting that, unlike ships that travel in international waters, "planes that pass through international airspace do not present any possibility of foreign contacts other than that presented by their actual stopping in a foreign country").

Even the dissent in *Ramirez–Ferrer* conceded that "[i]t is far from clear whether carrying drugs aboard a scheduled nonstop airline flight between two U.S. points could ever be treated as importation under the [statute's second] clause; a defendant would certainly argue that for all practical purposes, drugs on such a flight are never outside the country." 82 F.3d at 1146 (Boudin, J., dissenting).

**20.** *But cf. United States v. Cadena,* 585 F.2d 1252, 1259 (5th Cir.1978) ("Because importation necessarily originates in an act in a foreign country, it is apparent that Congress intended that 21 U.S.C. § 952 and § 963 apply to persons who commit acts or a series of acts that at least commenced outside the territorial limits of the United States."), *overruled on other grounds by United States v. Michelena–Orovio,* 719 F.2d 738 (5th Cir.1983).

vessel that had—for example, a 'mother ship.'" As was the case in *Peabody*, however, there was no evidence that the drugs in question originated in the United States. The facts of *Phillips* involved drugs that were brought into the United States from Colombia from motherships off the coast of Florida. *Id.* at 987. *Phillips* therefore does not provide support for the contention that § 952(a) prohibits the domestic transport of drugs through international airspace.

The Eleventh Circuit cases cited by the government are similarly inapt. In *United States v. Lueck*, 678 F.2d 895, 904–05 (11th Cir.1982), the court relied on the dictum from *Peabody* in holding that "[a]ny point outside[the] twelve mile limit of airspace and waters constitutes 'a place outside the United States' for purposes of proving importation under § 952(a). . . . The fact of crossing the boundary of the United States with contraband suffices to establish importation." The Eleventh Circuit reiterated this point in *United States v. Goggin*, 853 F.2d 843 (11th Cir.1988), holding that "[t]he government may prove that a defendant imported cocaine into the United States 'from any place outside thereof' by showing that the defendant brought cocaine into the country from international waters or from airspace in excess of twelve geographical miles outward from the coastline." *Id.* at 845 (citing *Lueck*, 678 F.2d at 905). In both *Lueck* and *Goggin*, however, the evidence suggested that the flights in question had originated in the Bahamas—not in the United States. *Lueck*, 678 F.2d at 896–97; *Goggin*, 853 F.2d at 843, 844. The domestic transport of narcotics was not demonstrated in either case.

■ In fact, the only cases to adopt the government's proposed interpretation of § 952(a) under factual circumstances similar to those presented here are our decisions in *Perez*, 776 F.2d at 801, and *Sugiyama*, 846 F.2d at 572. As an en banc court we are not bound by these panel opinions. Upon analysis, given the factual circumstances here, we no longer consider them to have correctly construed the statute.

In *Perez*, the defendant was convicted under § 952(a) of importing drugs on a boat that sailed from Rota, an island in the Commonwealth of the Northern Mariana Islands (a United States territory), to Guam. We affirmed the convictions, holding that all that the government must show for a finding of importation under § 952(a) is that the drugs entered the United States from international waters or airspace. *Perez*, 776 F.2d at 801 (citing *Lueck*, 678 F.2d 895). In reaching this conclusion, the opinion did not analyze the statute or the implications of its interpretation. Instead, it rested its holding on the dicta in *Peabody* and *Lueck*, which themselves failed to address the statutory language. *Id.*

*Sugiyama* likewise adds nothing to our understanding of the scope of § 952(a), as it relied solely on *Perez* in affirming the conviction of a defendant under § 952(a) for importing drugs on a flight from the island of Palau (which at the time was part of the United States Trust Territory of the Pacific Islands) to Guam. *Sugiyama*, 846 F.2d at 572. Neither *Sugiyama* nor *Perez* spoke to the concerns we confront today regarding the plain meaning of the statutory language, the statutory structure or the implications of a finding that § 952(a) reaches domestic conduct. To the extent that *Sugiyama* and *Perez* address the transport of drugs through international airspace on a nonstop domestic flight, they

are overruled.[21]

### III.

Our analysis leaves little doubt that the second clause of § 952(a) does not proscribe the transport of drugs on a nonstop flight from one domestic location to another, but to the extent that any doubt remains, the scope of the statute is sufficiently ambiguous to invoke the rule of lenity. "In these circumstances—where text, structure, and history fail to establish that the Government's position is *unambiguously* correct—we ... resolve the ambiguity in [the defendant]'s favor." *United States v. Granderson*, 511 U.S. 39, 54, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (emphasis added). *See also United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) ("[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.") (internal quotation marks omitted); *People v. Materne*, 72 F.3d 103, 106 (9th Cir.1995) ("[T]he rule of lenity applies where a criminal statute is vague enough to deem both the defendant's and the government's interpretations of it as reasonable."). In light of the statutory language and structure and the disagreement among the circuit courts about the reach of the statute, it is evident that the government's position is far from unambiguously correct. Accordingly, we hold that the transport of drugs through international airspace on a nonstop flight from one United States location to another does not constitute importation within the meaning of § 952(a).[22]

### IV.

We are not persuaded by warnings of the government and the dissent that our decision today will cripple the government's efforts—any more than did the First Circuit's 1996 decision in *Ramirez–Ferrer*—to fight the ongoing war on drugs. Our holding addresses those cases in which the undisputed evidence shows that the nonstop flight on which the defendant transported drugs departed and landed in the United States. Our interpretation of § 952(a) thus does not preclude the government from proving importation when a drug-laden plane of unknown origin is discovered in international air-space before it has crossed into U.S. territory. In such a situation, the government has found the plane outside the United States and therefore has circumstantial evidence that the aircraft originated *from a place* outside the United States. We need not decide today whether such evidence alone would be sufficient to support a conviction under § 952,

---

**21.** Because we confine our holding to the transport of drugs on an aircraft that travels nonstop through international airspace en route between two United States locations, we express no opinion on the continuing vitality of *Perez* with respect to the maritime transport of drugs in international waters. That is an issue for another day.

**22.** The dissent contends that the rule of lenity is inapplicable here because the Cabaccangs were on notice from our decisions in *Perez* and *Sugiyama* that their conduct was unlawful. However, the purpose of the rule of lenity is not merely to ensure that defendants have notice of the criminality of their actions. The rule is also founded on the principle that "because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *Bass*, 404 U.S. at 348, 92 S.Ct. 515. If there is any doubt about whether Congress intended § 952 to prohibit the conduct in which the Cabaccangs engaged, then "we must choose the interpretation least likely to impose penalties unintended by Congress." *United States v. Arzate–Nunez*, 18 F.3d 730, 736 (9th Cir.1994).

because the government here does not dispute the defendants' contention that the flights in question departed from the United States.[23]

■ Our holding also leaves undisturbed our well-settled case law establishing that importation occurs when a person reenters the United States from a foreign country carrying drugs that were in her possession when she left the United States. *See, e.g., United States v. Friedman*, 501 F.2d 1352, 1353–54 (9th Cir.1974) (affirming the conviction of a defendant who reentered the United States from Mexico carrying drugs that were with him when he left the United States). A defendant who drives from San Diego to Mexico with a package of cocaine in her trunk and returns to San Diego still in possession of that package has committed an act of importation, even though the drugs themselves originated in this country, because the defendant thereafter brought them back into the United States from Mexico— from a "place outside thereof" within the commonsense meaning of § 952(a).

■ Moreover, we are not leaving the government without recourse to punish the Cabaccangs and others who bring drugs from one United States location to another through international airspace. As the dissent itself acknowledges, "[p]ossession of illegal narcotics is already a serious offense," and any conduct that would have been chargeable as importation under the government's reading of § 952(a) may be charged under 21 U.S.C. § 841 as possession with intent to distribute.[24] Section 841 carries steep mandatory minimum penalties that closely track those available for violations of § 952(a).[25] Indeed, this very case amply demonstrates that our decision will not deplete the government's antidrug arsenal: Notwithstanding our reversal of their importation-related convictions, each of the Cabaccang brothers will still serve a life sentence for his involvement in the methamphetamine ring. Today's decision does nothing more than prevent the government from charging as importation conduct that can only be characterized as the domestic transport of drugs.

In sum, our analysis of the statutory text and structure leads us to conclude that the second clause of 21 U.S.C. § 952(a) does not proscribe—and was not intended to proscribe—the transport of drugs on a nonstop flight between two locations within the United States. A de-

---

23. Our decision therefore is not inconsistent with the result—if not the reasoning—reached by the Fifth Circuit in *Peabody* and *Phillips*. In those cases, there was no evidence of domestic origin to contradict the government's circumstantial evidence that the vessels found entering the United States from international airspace or waters departed from a place outside the United States. *See supra* Part II. Nor is our decision at odds with the outcome in *Goggin*, 853 F.2d at 846, in which the jury rejected the defendant's testimony that his flight departed from Atlanta in favor of the government's evidence that the flight took off from the Bahamas, or with that in *Lueck*, in which the only evidence of domestic origin was the defendant's uncorroborated testimony that he had taken off from the Florida Keys. *Lueck*, 678 F.2d at 897. Because our

holding is limited to cases in which the evidence shows beyond dispute that the drugs in question were transported on a nonstop flight between two domestic locations, it does not conflict with the cases applying § 952(a) to the transport of drugs into the United States from an offshore mothership or from an aircraft or vessel first discovered outside the United States.

24. Where the facts do not support a finding of intent to distribute, such as where the drug quantity at issue is too small, the government may charge the conduct as simple possession under 21 U.S.C. § 844.

25. *See* 21 U.S.C. § 960 (listing the penalties for violations of § 952(a)).

cision to the contrary would contravene the plain meaning of the statute and produce absurd and unreasonable results. Accordingly, we reverse the defendants' convictions for conspiracy to import methamphetamine, importation of methamphetamine and attempted importation of methamphetamine.

## V.

The effect of our decision on Roy Cabaccang's conviction for conducting a continuing criminal enterprise (Count I) is not so clear. Count I incorporated the importation charges as predicate offenses, and the jury was instructed that to convict on that count it had to find that "the Defendant committed any one or more of the following federal narcotics trafficking offenses: conspiracy to distribute methamphetamine; conspiracy to distribute methamphetamine; or, conspiracy to import methamphetamine; or, importation of methamphetamine; or, possession of methamphetamine with intent to distribute; or, attempted importation of methamphetamine." The jury was also instructed that it must find that the offenses were part of a series of three or more offenses committed by the defendant, and that the defendant committed the offenses together with five or more persons. Finally, the jury was instructed that all members of the jury must unanimously agree on which three narcotics offenses the defendant committed and on which five or more persons committed the offenses together with the defendant. The jury's guilty verdict on Count I did not specify which narcotics offenses formed the basis of the jury's finding.

It is not for us to determine whether the jury relied on the importation offenses in reaching a verdict on Count I or whether, if the jury did so rely, there was sufficient additional evidence of a continuing criminal enterprise to support the conviction. These questions are more appropriately considered by the district court. We therefore remand Count I to the district court for a determination of whether Roy's conviction on that count can stand in light of our holding.

## Conclusion

Because the transport of drugs on a nonstop flight from California to Guam does not constitute importation within the meaning of 21 U.S.C. § 952(a), we reverse all three defendants' convictions for conspiracy to import methamphetamine (Count III), Richard and Roy's convictions for importation of methamphetamine (Count V) and Roy's convictions for attempted importation of methamphetamine (Counts IX, X and XI). We remand to the district court for a determination of whether Roy's conviction for a continuing criminal enterprise (Count I) can stand in light of our reversal on the importation counts. As to the Cabaccangs' challenges to their convictions and sentences on the counts that are not importation-related, we adopt the panel decisions as our own and therefore affirm the judgment of the district court as to those counts.

AFFIRMED in part, REVERSED in part, REMANDED in part.

SCHROEDER, Chief Judge, concurring:

I agree with the result. All three defendants were convicted under 21 U.S.C. § 952(a), importation of controlled substances. The crime was transporting illicit drugs from California to Guam. This was transportation from the continental United States to a territory of the United States that has its own customs authority.

The language of the statute provides:

It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance . . . or any narcotic drug. . . .

21 U.S.C. § 952(a).

The first clause states that it is illegal to take drugs from non-customs territory of the United States to customs territory of the United States. The defendants did not do this.

The second clause bars the taking of drugs from foreign territory into the United States. The defendants did not do this either. Therefore, the statute was not violated.

The concerns reflected in both the dissent and the majority opinion about crossing international waters are not relevant to the interpretation of the plain language of the statute as I read it. Nevertheless, I do concur wholeheartedly in the result reached by the majority.

KOZINSKI, Circuit Judge, with whom O'SCANNLAIN, GRABER, McKEOWN and TALLMAN, Circuit Judges, join, dissenting:

Our job as judges is to apply laws adopted by the political branches of government. As the Supreme Court has told us time and time again, *see, e.g., HUD v. Rucker*, 535 U.S. 125, 130–31, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002); *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 490–93, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001), where the statutory text is clear and speaks to the issue before us, we must faithfully enforce it, even if we firmly believe we could rewrite the statute to make it better.

And rewrite the statute is precisely what the majority does.[1] There is no conceivable interpretation of its simple words that could yield one result where drugs are brought into the United States by air and a different one where they are brought in by sea. Instead, the majority has taken a blue pencil and inserted the words "except when the drugs are brought in on a non-stop flight originating in the United States." If this is a sensible exception, it's not one Congress has adopted, and no amount of massaging the word "from" can possibly yield such a specific and finely tuned result. The majority's statutory revisionism puts us in conflict with other circuits and will immensely complicate law enforcement efforts to protect our borders from the scourge of illegal drugs. It is the triumph of judicial will over innocent words that have no way to fight back.

### The Text

1. Section 952(a) states:

It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance. . . .

21 U.S.C. § 952(a). And section 951(a)(1) adds:

The term "import" means, with respect to any article, any bringing in or introduction of such article into any area (whether or not such bringing in or introduction constitutes an importation

---

1. I refer to Judge Fisher's opinion throughout as the "majority." Although only four other judges join, his opinion resolves the case on narrower grounds than Chief Judge Schroeder's concurrence and therefore represents the binding rationale of the court under *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

within the meaning of the tariff laws of the United States).

21 U.S.C. § 951(a)(1).

It's difficult to imagine what more Congress could have said to keep us from going astray. Congress did not merely use the term "import" and leave it to the courts to flesh out its meaning. Rather, it went to the trouble of defining the term as "any bringing in or introduction of such article into any area." *Id.* It even explicitly foreclosed the notion that tariff-law definitions of "import" are germane. *Id.* Thus, the majority's observation that "[w]e do not treat passengers who travel through international airspace on a non-stop flight between two U.S. locations as ... subject to immigration inspections or border searches," Maj. op. at 626, is utterly irrelevant. Nor does it matter that ships only going out to international waters do not clear customs on their return. *See United States v. Ramirez–Ferrer,* 82 F.3d 1131, 1136 n. 4 (1st Cir.1996) (en banc). Congress specifically rejected traditional notions of importation as a benchmark. The only pertinent question is whether defendants brought drugs into the United States from any place outside thereof.

The Cabaccangs conspired to bring a large quantity of drugs into Guam, a U.S. island surrounded by miles of ocean. It is impossible to get there without first passing through international waters or airspace. Defendants' criminal scheme thus fits perfectly within the statutory definition: Their co-conspirators brought drugs into the United States (Guam) from "any place outside thereof" (international airspace surrounding Guam).

The majority does not seriously dispute that international airspace is a "place" in normal English usage. Maj. op. at 626. A "place," after all, is only a "region; locality; [or] spot" —a "location," "position" or "site." *Webster's New International Dictionary of the English Language* 1449, 1877, 1925, 2350 (William Allan Neilson et al. eds., 2d ed.1939). None of these definitions has anything to do with whether the "place" is occupied by air or terra firma, within a country's borders or over the high seas.

What the majority is really arguing is that international air-space, although a place, is not the place drugs come *from* when they cross back into the United States—even if the so-called "international" airspace is above another sovereign nation like Canada, Maj. op. at 631. The majority claims "it is clear ... that a defendant who has brought drugs on a non-stop flight that lands in the United States can most reasonably be said to have brought drugs *from* the point of the flight's departure—and not the airspace *through* which the plane traveled on the way." Maj. op. at 627. It thus reads "from" in section 952(a) to mean only "originally from." But nothing in the statute compels or even suggests that limitation.

"From" can imply origin, but it can also mean simply "forth out of," "away out of contact with or proximity to," or merely "out of." *Webster's, supra,* at 1012. One need look no further than *Ramirez–Ferrer* to find the word so used. *See* 82 F.3d at 1142 (discussing the sailboat that "tack[s] out *to and from* international waters" (emphasis added)). The airstrip where a defendant takes off is one place he comes from, but certainly not the only one. If I ship an antique Persian rug from Baltimore to Los Angeles, it comes from Baltimore, but also from Indianapolis, Amarillo and many other places along the way; when it enters California, it does so from Nevada or Arizona. And, of course, it originally comes from the Middle East. A person traveling from Place A to Place B

to Place C arrives at C both *from* A and *from* B. He comes from A originally and from B immediately; B is both the place *through* which he passes on the way from A to C, and *from* which he arrives immediately at C.

The majority would ask a hypothetical bystander "from what place the Cabaccangs brought drugs into Guam." Maj. op. at 627. That's a trick question because it assumes the point in contention, namely, that there's a single, unique place the drugs came from. The point of departure may be the place that first pops to mind,[2] but that doesn't mean the point of immediate entry into the United States is not *also* a place the drugs came from. The correct question is not, "From what place did these drugs come?," but "Did these drugs enter the United States *from* international airspace?" And any bystander would readily answer *that* question in the affirmative.

The majority's claim that the plain language of the statute supports its interpretation is plainly wrong. Maj. op. at 627. A statute does not have a plain meaning just because one cherry-picked dictionary definition happens to support it. That eight other decisions—apparently every one to have addressed the issue save *Ramirez-Ferrer*—have reached the contrary result undercuts the claim that the statute *plainly* means what the majority says. *See United States v. Nueva*, 979 F.2d 880, 884 (1st Cir.1992); *United States v. Goggin*, 853 F.2d 843, 845 (11th Cir.1988);

*Guam v. Sugiyama*, 846 F.2d 570, 572 (9th Cir.1988) (per curiam); *United States v. Perez*, 776 F.2d 797, 801 (9th Cir.1985); *United States v. Lueck*, 678 F.2d 895, 905 (11th Cir.1982); *United States v. Phillips*, 664 F.2d 971, 1033 (5th Cir. Unit B 1981), *superseded by rule on other grounds as stated in United States v. Huntress*, 956 F.2d 1309, 1316 (5th Cir.1992); *United States v. Seni*, 662 F.2d 277, 286 (4th Cir.1981); *United States v. Peabody*, 626 F.2d 1300, 1301 (5th Cir.1980).

If the majority had picked a definition of "from" and stuck with it, I would still disagree, but our disagreement would at least be about what the word actually means. The majority does *nothing of the* sort. Instead, it crafts a rule that applies only to "the transport of drugs on an aircraft that travels nonstop through international airspace en route between two United States locations." Maj. op. at 635 n. 21. It thus "leaves undisturbed our well-settled case law establishing that importation occurs when a person reenters the United States from a foreign country carrying drugs that were in her possession when she left the United States." *Id.* at 636 (citing *United States v. Friedman*, 501 F.2d 1352, 1353–54 (9th Cir.1974)). And, because it overrules *Perez* and *Sugiyama* only "[t]o the extent that [they] address the transport of drugs through international airspace on a nonstop domestic flight," *id.* at 634, it also leaves intact our prior law with respect to all maritime transportation.[3]

2. Though this depends on context. A discriminating buyer who wants to know where the drugs are from might well expect to hear where the weed was grown; an air traffic controller who wants to know whence the plane with the drugs is approaching would no doubt expect coordinates in international airspace.

3. The majority purports to "express no opinion ... with respect to the maritime transport

of drugs in international waters. That is an issue for another day." *Id.* at 635 n. 21. But it cannot so easily escape the consequences of its ruling. Because the majority overrules *Perez* and *Sugiyama* only "[t]o the extent that [they] address the transport of drugs through international airspace on a nonstop domestic flight," *id.* at 634, those decisions remain binding circuit law in all other respects. Maritime transport is an "issue for another

So the majority isn't fully persuaded by its own argument that "from" means "originally from" in section 952(a). If it were, it would have to overrule *Friedman* (because a person who takes drugs from the United States to Mexico and back is coming originally from the United States) as well as the rest of *Perez* and *Sugiyama* (because a person taking a boat from the United States through international waters and back is also coming originally from the United States). Rather, "from" now means "originally from" when applied to planes, but plain old ordinary "from" for everything else. We're told:

> [T]he distinction between air and water transport of drugs is hardly arbitrary. It is possible for a ship to pick up foreign passengers or cargo while passing through international waters, whereas the same cannot be said of a nonstop flight between two domestic locations.

Maj. op. at 633 n. 19. That's a pretty good policy distinction (and one we would undoubtedly uphold as rational had Congress enacted it), but it has absolutely nothing to do with the meaning of the word "from," which is the fulcrum of the majority's analysis. After today's decision, a ship that transports a cargo of drugs from Los Angeles to Guam will be deemed to have imported them into Guam, even if it goes there without stopping or picking up anyone or anything along the way. And, a passenger carrying drugs on a nonstop bus trip from Buffalo to Detroit through Canada will be deemed to have imported the drugs, even though a helpful bystander asked where the drugs came from would say "Buffalo, of course." Why does the boat enter the United States *from* international waters and the bus enter the United

States *from* Canada, but a plane on a nonstop flight that passes through international airspace or over a foreign country enter the United States only *from* the place it took off? "From" may have many definitions, but none is supple enough to change meanings depending on the mode of transportation employed.

The majority's insuperable problem is that the distinction it draws finds no anchor in the words of the statute it purports to interpret. The statute says nothing about planes, boats, trains or automobiles; it only says "from," an entirely neutral term. To reach the result consistent with the majority's policy preferences, the statute cannot be "interpreted" in any meaningful sense of the term; it must be rewritten. This is not a case where we must deform the English language to save the statute from unconstitutionality. *See, e.g., United States v. X–Citement Video, Inc.,* 513 U.S. 64, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). Rather, the majority simply rewrites the statute because it likes it better this way. That is a function entrusted by the Constitution to Congress and the President, branches of government whose job it is to make such quintessentially political choices. By usurping it, my unelected colleagues have assumed powers inconsistent with our judicial role.

2. The majority tries hard to defend its reading on statutory history grounds. It notes that Congress added the words "from any place outside thereof" when it amended the statute in 1970, Maj. op. at 625–26, and reads this new "any place" phrase as a *limitation* on the statute's scope. Why else, wonders the majority,

---

day" only in the sense that the en banc court could someday decide to overrule *that* aspect of *Perez* and *Sugiyama* as well; district judges

and panels of our court remain bound by the cases to the extent the majority has consciously decided not to overrule them.

would Congress *ever* have added these words?

If the answer to the majority's ingenuous question is not immediately apparent, perhaps the following analogy will help. The Bald and Golden Eagle Protection Act makes it illegal, among other things, to "import, at any time or in any manner, any bald eagle." 16 U.S.C. § 668(a). The majority's analysis of this statute might go something like this: "Hmmm. Congress couldn't have intended to ban *all* importation of bald eagles, because then the phrase 'at any time or in any manner' would be superfluous—Congress could simply have made it illegal to 'import any bald eagle.' It must have added 'at any time or in any manner' to narrow the sweep of the statute to importation at *times* and in *manners,* and exclude importation at *non-times* or in *non-manners.*" Absurd as it sounds, this is the majority's logic.

The obvious reason Congress included the words "any place" was to *negate* the very inference the majority draws—that the statute reaches only importation from *some* places: foreign countries, foreign countries plus hovering drug boats, or foreign countries plus some other limited set of places. "Any place" is like "any time" or "any manner"—a catchall Congress adds when it wants to emphasize that the statute applies to absolutely everything within a particular genus. *See Rucker,* 535 U.S. at 131, 122 S.Ct. 1230 (" '[T]he word "any" has an expansive meaning, that is, "one or some indiscriminately of whatever kind." ' " (quoting *United States v. Gonzales,* 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997))). There is nothing superfluous about such phrases, and the reason is simple: We judges have a habit of coming up with rules like "[A] thing may be within the letter of the statute and yet not within the statute." *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226 (1892). "Any place" is Congress's way of telling us

"We mean it!" The words have operative effect because they negate the inference that the statute means less than it says—an inference judges are all too willing to draw, as the majority well demonstrates.

The words are particularly apt here because Congress had good cause to worry that judges might read implicit limitations into the statute. Even when context does not require it, courts have "not unnaturally fallen into the habit of referring to imports as things brought into this country *from a foreign country.*" *Hooven & Allison Co. v. Evatt,* 324 U.S. 652, 669, 65 S.Ct. 870, 89 L.Ed. 1252 (1945) (emphasis added), *overruled on other grounds by Limbach v. Hooven & Allison Co.,* 466 U.S. 353, 104 S.Ct. 1837, 80 L.Ed.2d 356 (1984); *see, e.g., Leary v. United States,* 395 U.S. 6, 46, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) (assuming importation is equivalent to foreign origin). There is a long line of cases, for example, adopting the following formulation:

> The common ordinary meaning of the word "import" is to bring in. Imported merchandise is merchandise that has been brought within the limits of a port of entry *from a foreign country* with intention to unlade, and the word "importation" as used in tariff statutes, unless otherwise limited, means merchandise to which that condition or status has attached.

*United States v. Estate of Boshell,* 14 Ct. Cust. 273, 275 (1922) (emphasis added), *quoted in, e.g., Estate of Prichard v. United States,* 43 C.C.P.A. 85, 87, 1956 WL 8334 (1956); *Sherwin–Williams Co. v. United States,* 38 C.C.P.A. 13, 18 (1950); *United States v. John V. Carr & Son, Inc.,* 266 F.Supp. 175, 178 (Cust.Ct.1967); *Camera Specialty Co. v. United States,* 146 F.Supp. 473, 476 (Cust.Ct.1955). Congress may well have been concerned that courts would read a foreign origin requirement into the statute and responded by adding the words "any place."[4]

---

4. Congress took similar precautions by defining "import" broadly in section 951(a). That

The majority hands Congress a catch-22: If it uses simple language, judges will find hidden within it all sorts of implicit limitations, but if it adds language to underscore that a statute should be given a broad, literal compass, judges will point to the redundancy as a justification for a *narrower* reading—because, after all, the literal meaning would have been implicit in the unadorned text. This judicial three card monte is useful in letting us reach whatever result we please, but I suspect Congress would prefer we take it at its word.

3. The majority also purports to rely on statutory structure.· Maj. op. at 627–28. It borrows its argument from *Ramirez–Ferrer*, 82 F.3d at 1137–39, which thought that the government's interpretation of the second clause of section 952(a) ("into the United States from any place outside thereof") would render the first clause ("into the customs territory of the United States from any place outside thereof (but within the United States)") superfluous. It explained:

> The government's broad reading of clause 2 ... brings any conduct conceivably addressed under clause 1 within the coverage of clause 2. In other words, any contraband shipped from a place inside the United States (but not within the customs territory—e.g., the U.S. Virgin Islands) would first pass through international waters before it entered into the customs territory of the United States.... Hence, the government's reading of clause 2 renders clause 1 completely superfluous.

*Id.* at 1138. As the majority admits, Maj. op. at 627 n. 11, this theory is based on a geographical premise that's demonstrably false. The U.S. Virgin Islands—the very noncustoms territory *Ramirez–Ferrer* singled out as an example—in fact *is* contiguous with the customs territory, namely, Puerto Rico. *See* Nat'l Oceanic & Atmospheric Admin., *Chart # 25650: Virgin Passage and Sonda de Vieques* (33d ed. Mar.9, 2002), attached as an appendix.[5] Flights from St. Thomas, Virgin Islands, to almost *anywhere* in Puerto Rico never leave U.S. airspace, unless they make an enormous detour to the north or south. It's easy to pass from noncustoms territory to customs territory without leaving the United States, and by doing so to violate the first clause of section 952(a) without also violating the second.

definition does not, however, render the words "any place" in section 952(a) redundant. Courts interpreting tariff laws have read other limits into the terms "import" and "bring in"— for example, that the defendant have "intention to unlade" and enter "within the limits of a port of entry" rather than just passing through territorial waters. *E.g., Boshell*, 14 Ct. Cust. at 275. Section 951(a) rejects the technical tariff definition but doesn't specify which elements of the definition Congress views as technical and which it views as inherent in the concept of "bringing in." "Any place" resolves any lingering ambiguity over a foreign origin requirement. .

5. St. Thomas and Puerto Rico Island themselves are separated by more than twenty-four miles, but the strait between them is littered with smaller islands, notably the Puerto Rican island of Culebra. And "[e]very island, even those too small for effective occupation, has a territorial sea." 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 2–10, at 29 (2d ed.1994). As the attached nautical chart shows, the distance from the easternmost point of Puerto Rico (Isla Culebrita, off the east coast of Culebra) to the westernmost point of the Virgin Islands (Sail Rock, south-southwest of Savana Island, in turn west of St. Thomas) is a mere seven miles—nowhere close to twenty-four. All points between Puerto Rico's main island and St. Thomas are well within twelve miles of some smaller island, so the two are contiguous.

Thus, when *Ramirez–Ferrer* claimed that "any contraband shipped from a place inside the United States (but not within the customs territory ...) would first pass through international waters before it entered into the customs territory of the United States," 82 F.3d at 1138, it was wrong. When it claimed that "[a]ny place that is just outside the customs territory of the United States is international waters," *id.*, it was wrong. When it claimed that an individual entering the customs territory "would always be directly shipping from international waters," *id.*, it was wrong. When it spent two pages hammering away at this single point—the crown jewel of its analysis—it was actually driving the nails into its own jurisprudential coffin.

In an effort to salvage something from *Ramirez–Ferrer*'s glorious wreckage, the majority offers up two anemic theories. It first argues that, even though *Ramirez–Ferrer*'s premise is wrong today, it was correct in 1970 when Congress passed section 952(a) because the United States then claimed a territorial sea of only three miles rather than twelve. Maj. op. at 628–629. The territorial sea, however, is only the boundary for general-purpose jurisdiction. Congress long ago established a special, twelve-mile boundary specifically for interdiction. *See* Act of Aug. 5, 1935, ch. 438, §§ 201, 203, 49 Stat. 517, 521–22 (codified in relevant part at 19 U.S.C. §§ 1401(j), 1581(a)-(b)) (granting customs and Coast Guard officers jurisdiction to board vessels within U.S. customs waters, defined to ex-

tend four leagues, i.e. twelve miles, from shore); *see also* Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, art. 24, 516 U.N.T.S. 206, 220; 4 Whiteman *Digest* § 20, at 489 (Dep't of State 1965).

Section 952(a) does not refer to territorial waters, but to the "United States," 21 U.S.C. § 952(a), defined as "all places and waters, continental or insular, subject to the jurisdiction of the United States." *Id.* § 802(28); *incorporated by id.* § 951(b). Four cases have considered whether this definition invoked the federal twelve-mile interdiction jurisdiction rather than the narrower three-mile one and concluded that it did: "[T]he twelve-mile contiguous zone over which the United States exercises customs authority ... is included in the meaning of 'the United States' in 21 U.S.C. § 952(a)." *Goggin,* 853 F.2d at 845; *accord Nueva,* 979 F.2d at 884; *Lueck,* 678 F.2d at 905; *Seni,* 662 F.2d at 286. *But cf. Perez,* 776 F.2d at 802 n. 5 (addressing the analogous issue of a *territorial* contiguous zone).[6]

This mountain of consistent authority is no impediment for the majority: It's two-for-one day at Circuit Split Emporium, as we boldly go where no other circuit has gone before in holding that section 952(a) does *not* apply to the contiguous zone. This holding will have tremendous practical significance given the President's recent extension of the contiguous zone from twelve to twenty-four miles. *See* Procla-

---

6. *Nueva* involved conduct occurring after the 1988 proclamation that extended the territorial sea to twelve miles. But the proclamation itself was non-self-executing, *see* Proclamation No. 5928, Territorial Sea of the United States of America, 54 Fed.Reg. 777, 777 (Dec. 27, 1988) ("Nothing in this Proclamation ... extends or otherwise alters existing Federal or State law or any jurisdiction, rights, legal interests, or obligations derived therefrom ...."), and the new boundary was not incor-

porated into domestic criminal law until 1996, *see* Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, § 901(a), 110 Stat. 1214, 1317. It is highly debatable whether the government could have prosecuted based on the proclamation alone. *Nueva* thus understandably relied on pre-1988 decisions interpreting "United States" to include the contiguous zone rather than the 1988 proclamation. *See* 979 F.2d at 884 (citing *Goggin* ).

mation No. 7219, Contiguous Zone of the United States, 64 Fed.Reg. 48,701 (Aug. 2, 1999). But the prospect of forcing the government to follow one boundary in the Ninth Circuit and a different one everywhere else gives the majority no pause.

The only authority the majority offers is *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989), a case that has nothing to do with either drug interdiction or the contiguous zone. *Argentine Republic* invoked the canon against extraterritoriality in holding that the Foreign Sovereign Immunities Act does not apply to the high seas. *Id.* at 439–41, 109 S.Ct. 683. It is one thing to argue, as the respondents did in *Argentine Republic,* that the United States includes the high seas—i.e., roughly 70% of the Earth's surface area. It is quite another to say that the term "United States" in a *drug interdiction* statute invokes the twelve-mile *interdiction* boundary rather than the three-mile plenary one. The former is a bona fide extraterritorial application of federal law, clearly implicating the purposes of the canon. The latter just as clearly is not. The twelve-mile interdiction boundary is well-recognized in both international and federal statutory law. Presuming that Congress intends to invoke it when it passes a statute relating to the specific subject matter of drug interdiction does not present the same issues of extraterritoriality as asserting jurisdiction over two-thirds of the planet.

The majority has no good excuse for putting us at odds with every other circuit to have considered this issue. We should not break ranks on an issue that's at best debatable solely to save an otherwise hopeless textual argument. Were it necessary to reach the issue, I would hold that Congress invoked the twelve-mile interdiction boundary rather than the three-mile plenary one when it enacted section 952(a). At the very least, Congress reasonably could have believed that courts would interpret the statute that way—as in fact they have—and that's enough to render the first clause nonsuperfluous.[7]

The majority's second effort to glue *Ramirez–Ferrer*'s pieces back together consists of the theory that, even if Puerto Rico and the Virgin Islands were contiguous, Congress didn't know or didn't care. Maj.

7. The majority misses the boat when it claims that "[i]t is not enough ... that Congress 'reasonably could have believed' that § 952 invoked this 12 mile limited interdiction jurisdiction." Maj. op. at 628. It's true that when we're interpreting a statute, "[o]ur role is to determine Congress' actual intent, not its possible intent." *Id.* In this case, however, the three-mile/twelve-mile issue is not the question of statutory interpretation presented. We're conducting a surplusage analysis, and a provision can be nonsurplus even if it responds only to the possibility that another provision might be interpreted a particular way. *See Chevron U.S.A. Inc. v. Echazabal,* 536 U.S. 73, 87, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002) (finding a provision nonsurplus even though it merely "made a conclusion clear that might otherwise have been fought over in litigation"). Congress legislates in the shadow of uncertainty over how its statutes will be construed. *See, e.g.,* Food and Drug Administration Modernization Act of 1997, Pub.L. No. 105–115, § 422, 111 Stat. 2296, 2380 ("Nothing in this Act ... shall be construed to affect the question of whether the [FDA] has any authority to regulate any tobacco product ...."). Our power to resolve those uncertainties doesn't change the fact that Congress can't always predict what we'll do. There are two reasonable explanations for clause 1 consistent with the government's theory: (1) Congress actually intended to enact the twelve-mile boundary; and (2) Congress wasn't sure whether courts would use the twelve-mile boundary or the three-mile one (maybe even members of Congress couldn't agree), and it passed clause 1 so that, either way, the Virgin Islands–Puerto Rico border would be covered. Either is a perfectly valid reason to enact clause 1, so the canon against surplusage doesn't apply.

op. at 629–30. But this stands the canon against surplusage on its head. It's one thing to give a statutory provision a strained construction to avoid what would otherwise be a genuine redundancy. It's another thing altogether to do so after manufacturing a redundancy by assuming Congress either didn't know or didn't care about the real world circumstances that give the language in question independent force. Presuming that Congress must have been confused about the details of American geography just because a bunch of federal judges and government lawyers were ignorant strikes me as very close to the classic definition of chutzpah. *See* Alex Kozinski & Eugene Volokh, *Lawsuit, Shmawsuit,* 103 Yale L.J. 463 (1993).

That Congress went to the trouble of including the somewhat convoluted phrase "into the customs territory of the United States from any place outside thereof (but within the United States)" shows it was focused on a very specific problem. There aren't many noncustoms territories to begin with; almost all the significant ones (Guam, the Marianas and Samoa) are way out in the Pacific, about 3000 miles from the nearest customs border. After that, we get into some pretty obscure places. *See, e.g., Farrell v. United States,* 313 F.3d 1214, 1215 (9th Cir.2002) (locating Johnston Island 700 miles west-southwest of Hawaii and providing helpful tax advice to its thousand or so residents). But there is one significant exception: the Virgin Islands, situated in the midst of the Caribbean, cheek-to-jowl with Puerto Rico. It is within easy reach of drug manufacturing sources in Central and South America, and an ideal launching pad for smuggling into Puerto Rico, which is only a few minutes away by plane and, at most, a couple of hours by boat. Ignoring this border because it's the "lone point of contiguity," Maj. op. at 629, is like telling the little

Dutch boy he can go home because the dike only has one leak.

Without the first clause of section 952(a), it would be impossible to prosecute as importation drug shipments from St. Thomas to Puerto Rico. Because the two territories are contiguous, any boat or plane carrying drugs across the Virgin Passage would not be "import[ing] into the United States from any place outside thereof." This is not some well-kept secret; it is obvious from even the most cursory glance at a nautical chart. Coast Guard and customs officers use those charts daily, and if there's a hole in the customs net where drugs slip through, they have every incentive to bring that fact to Congress's attention. The statute's first clause is absolutely necessary to render this traffic illegal.

The first clause is thus not "superfluous, void, or insignificant," and that is all the canon against surplusage requires. *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (internal quotation marks omitted). The text of the statute and the indisputable facts of American geography are proof enough that Congress knew what it was doing. It is presumptuous and somewhat insulting to a coordinate branch of government to assume Congress doesn't take its responsibilities seriously when performing its central function of drafting statutes. I, for one, cannot subscribe to that view.

The Virgin Islands–Puerto Rico border kicks the props out from under the majority's argument that we must ignore the literal terms of the statute in order to avoid redundancy. But no contemporary example is necessary to justify reading the law as written. Congress defined two classes of conduct it meant to prohibit. Whether those classes diverge or overlap depends on geography and politics, which are hardly set in stone. For example,

since 1970, the Northern Mariana Islands have become a commonwealth, and the Marshall Islands, Micronesia and Palau have all become independent states. *See* Proclamation No. 6726, Placing into Full Force and Effect the Compact of Free Association with the Republic of Palau, 59 Fed.Reg. 49,777, 49,777 (Sept. 27, 1994) (summarizing developments). The Canal Zone has reverted to Panama, *see* Panama Canal Treaty, Sept. 7, 1977, 33 U.S.T. 39, and the United States has extended both its territorial sea and its contiguous zone, *see* Proclamation No. 5928, 54 Fed.Reg. at 777; Proclamation No. 7219, 64 Fed.Reg. at 48,701. Many people want Guam to become a commonwealth; others clamor for Puerto Rico to become a state. Congress was no doubt aware that the status and scope of regions subject to U.S. jurisdiction change over time, and drafted a generic statute that would cover future contingencies. That is neither silly nor implausible. It's precisely what we would expect Congress to do when legislating in an area marked by flux. Clause 1 would thus not be surplusage even if it were entirely redundant at a particular moment of history.[8]

In any case, the customs and noncustoms territories *are* contiguous, as they were in 1970 when Congress enacted the statute. This inescapable geographical fact undercuts not only the majority's only plausible argument, but also *Ramirez–*

*Ferrer's* value as precedent. That case wasted nearly two pages on this issue, all based on the figment that the customs and noncustoms territories are never contiguous. It was decided by the thinnest of margins (4–3), and the outcome no doubt would have flipped had the First Circuit been aware of the truth.

## The Precedents

The effort to reconcile today's decision with cases in the Fifth and Eleventh Circuits does not bear serious scrutiny; the majority would do better to acknowledge the conflict. It claims that those cases "do not directly address the factual scenario presented here," Maj. op. at 633, because our plane concededly took off from California, while in *Peabody* and *Phillips,* there was "no evidence" that the drugs had originated in the United States, *id.* at 633–34, and in *Lueck* and *Goggin,* the evidence "suggested that the flights in question had originated in the Bahamas," *id.* at 634. Yes, but so what?

"[F]rom any place outside thereof" is an element of a criminal offense; the government bears the burden of proof. Absence of evidence favoring the government is legally equivalent to irrefutable evidence favoring the defendant—either way, the defendant goes free. Thus, for example, it does not matter that there was no evidence in *Peabody* the drugs had come from the United States, because there was also no

8. The majority thinks the principle of *expressio unius* is "yet another hurdle" to my interpretation. Maj. op. at 630–31. By banning importation from noncustoms territory to customs territory, Congress implied that shipments from customs territory to noncustoms territory would not be covered. I couldn't agree more. That's why someone who takes drugs from Puerto Rico to St. Thomas doesn't violate section 952(a). (How this "reinforces" the majority's conclusion, Maj. op. at 630, is a mystery.) Someone who takes drugs from California to Guam, on the other hand, *does* violate section 952(a)—not because he goes from customs territory to noncustoms territory (which we all agree is OK), but because he goes from international airspace to noncustoms territory. The majority doesn't think that counts, but that's precisely the question—whether bringing drugs from international airspace into noncustoms territory is importation. The majority's *expressio unius* argument is totally circular. At best, it's the exact same "hurdle" as its surplusage theory, just repackaged into a different argument.

evidence they had come from elsewhere. *See Peabody,* 626 F.2d at 1300–01. The conviction stuck, so the court must have believed that the point of origin—even if it *was* the United States—didn't matter.[9] For all we know, the drugs did originate in the United States; the opinion simply doesn't say.

*Lueck* and *Goggin* fall to the same axe. The majority asserts that evidence "suggested" the planes in those cases had departed from the Bahamas, but it misreads the opinions. The only pertinent reference in either is that the planes were first *detected on radar* flying near the Bahamas. *Goggin,* 853 F.2d at 844; *Lueck,* 678 F.2d at 896–97. The defendant in *Lueck* claimed he had taken off from the Florida Keys and crossed into international airspace to avoid the controlled zone around the Miami airport. 678 F.2d at 897. The jury never decided the issue, because the instructions made it sufficient to find entry from international airspace. *Id.* at 904–05. *Goggin* interpreted a verdict to imply only that the defendant had not departed from the *mainland* United States. 853 F.2d at 847. It didn't say anything else about origin. For all we know, the plane took off from Puerto Rico (which, after all, lies directly across the Bahamas from Florida). In each of the two cases, the court made no determination of the plane's origin, because it deemed that fact of no legal consequence.

The even bigger problem with the majority's Sisyphean attempt to avoid a second circuit split is that, even if the cases were reconcilable on their facts, the legal rules they articulate would still be incompatible with the majority's. *Lueck* and *Goggin* both hold that " '[t]he fact of cross-ing the boundary of the United States with contraband suffices to establish importation.' " *Goggin,* 853 F.2d at 845 (quoting *Lueck,* 678 F.2d at 905). And *Peabody* holds that "[the defendants] were apprehended outside the country, heading in . . . . That is enough." 626 F.2d at 1301. Neither of these rules is compatible with the majority's holding that crossing the boundary of the United States with contraband is not enough to establish importation because the government must also show the flight originated abroad.

Struggle as it may, the majority cannot escape the hard reality that its interpretation of section 952(a) conflicts with that of the Fifth and Eleventh Circuits. It also conflicts with that of the Fourth, *see Seni,* 662 F.2d at 286 ("The inference that the vessel sailed out from North Carolina, across the 12 mile limit permits, indeed virtually compels, the further inference that the trawler sailed back . . . . The jury could, therefore, reasonably conclude that the·most recent journey . . . was one involving importation."), and until recently the First, *see Nueva,* 979 F.2d at 884 ("[I]mportation of a controlled substance into the United States[ ] requires proof that the 'defendant [conspired to bring] cocaine into the country from international waters or from airspace in excess of twelve geographical miles outward from the coastline.' " (quoting *Goggin,* 853 F.2d at 845)), not to mention our own settled circuit law. If it were necessary to trample our precedents and contort the statute to hold formation with our sister circuits, I might see the need to do so. But the only case going the majority's way is *Ramirez–Ferrer*—and, now that its grand fallacy

---

9. This conclusion is not "dictum at best." Maj. op. at 633. *Peabody* held that the origin of the drugs—whether Texas or anywhere else—was irrelevant. The court never determined where the drugs originated, so its disposition was necessarily based on its determination that the possible domestic origin of the drugs was irrelevant.

has been exposed, far better to cut the tow rope and let it find its own way home.

### The Consequences

1. No one can doubt the devastating impact our holding will have on drug interdiction. Until today, the government could support an importation charge merely by tracking a plane on radar as it entered U.S. airspace. Now it must prove the trip originated abroad. Every smuggler flying a single engine prop has a ready-to-serve defense: He took off from a U.S. airfield, strayed into international airspace and was just coming back in when he got caught. The government surely cannot track the movement of every aircraft everywhere on the globe, so it must now prove foreign origin by circumstantial evidence. In some cases it may not be able to do so, and in many others it will have to divert prosecutorial resources that could be put to better use. *See Ramirez–Ferrer*, 82 F.3d at 1148 (Boudin, J., dissenting).

The majority claims that its holding only "addresses those cases in which the *undisputed* evidence shows that the nonstop flight … departed and landed in the United States." Maj. op. at 635 (emphasis added); *see also id.* at 636 n. 23. But there are no undisputed facts in criminal cases (unless the defendant finds some advantage in stipulating what he knows the government can prove anyway). "[F]rom any place outside thereof" is an element of the offense, so the government has a constitutional duty to prove it to a jury beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).[10] If the prosecution fails to present sufficient evidence to do so, it must lose. Because no defense lawyer would be dumb enough to stipulate away this key element of the crime, the government will always have to prove beyond a reasonable doubt that the flight originated abroad.[11] The majority's "undisputed evidence" limitation is a pipe dream.

Of course, entry from international airspace is circumstantial evidence of foreign origin. Maj. op. at 635. But it's circumstantial evidence the same way a defendant's presence at the murder scene is circumstantial evidence he's the killer. It's *some* evidence, but hardly sufficient. To convict a defendant, the government must produce evidence excluding every possible innocent explanation for his con-

---

10. Congress could, of course, make domestic origin an affirmative defense. *See Patterson v. New York*, 432 U.S. 197, 210, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). But it has not done so. If "from any place outside thereof" is a limitation on the statute's scope (as the majority believes), there is no way to read it as anything other than an element of the offense.

11. *Ramirez–Ferrer* committed an equally egregious error when it said that a jury could *presume* foreign origin from the mere arrival of a drug-laden ship. 82 F.3d at 1144. It relied on *Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970). *Turner*, however, involved a *statutorily prescribed* presumption. *See id.* at 404–05, 90 S.Ct. 642. Where a statute prescribes a presumption, the government need only show

that the " 'presumed fact is more likely than not to flow from the proved fact.' " *Id.* at 405, 90 S.Ct. 642 (quoting *Leary v. United States*, 395 U.S. 6, 36, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969)). For elements of a criminal offense, on the other hand, the standard of proof is not "more likely than not" but "beyond a reasonable doubt." *See Winship*, 397 U.S. at 364, 90 S.Ct. 1068. Judges are not free to water down this standard by inventing their own presumptions. *Ramirez–Ferrer* ignored this distinction. It's truly unfortunate that the federal courts, in an effort to save a tiny group of clearly guilty defendants caught redhanded, have diluted a bedrock rule of constitutional law designed to protect the presumption of innocence for all defendants in all criminal cases.

duct. *See United States v. Vasquez–Chan*, 978 F.2d 546, 549 (9th Cir.1992). The very examples the majority offers to prop up its reading of the statute—the flights from the lower forty-eight to Alaska or Hawaii, from Miami to Baltimore, from Tampa to Houston, or from Los Angeles to San Francisco, *see* Maj. op. at 631—undercut the claim that entry alone is sufficient proof of guilt. And smugglers will no doubt soon figure out the best places to enter U.S. airspace in order to make it look like a domestic reentry.

Striving once again to duck the logical consequences of its ruling, the majority stays mum as to whether entry alone would support a finding of foreign origin. *See id.* at 635–36. It's obvious it would not. *See United States v. Carrion*, 457 F.2d 200, 201–02 (9th Cir.1972) (per curiam) (insufficient evidence of foreign origin where a plane landed in Los Angeles with 404 pounds of marijuana in boxes bearing Spanish writing, one defendant was carrying a map of Mexico and a matchbook from a Mexican motel, and the plane had used enough fuel for a round trip to Mexico); *cf. Vasquez Chan*, 978 F.2d at 550–53 (insufficient evidence of possession where cocaine was found in the defendant's bedroom with her fingerprints on the containers). But even if it would, defense lawyers will use the majority's opinion as a hornbook in pointing out to the jury the many ways the government failed to prove that the defendant did not take off from the United States, and conscientious juries will come back with many unjust acquittals.

By rejecting both our own circuit's settled precedent and the overwhelming weight of authority elsewhere, the majority frustrates the government's vital interest in consistent and uniform interpretation of the drug laws. It's certainly our prerogative as an en banc court to overrule circuit law. *See Jeffries v. Wood*, 114 F.3d 1484, 1492 (9th Cir.1997) (en banc). But that doesn't mean it's a power wisely exercised every time we disagree with long-settled precedent. *See McKinney v. Pate*, 20 F.3d 1550, 1565 n. 21 (11th Cir.1994) (en banc). The government's interdiction strategies doubtless vary depending on whether it must prove foreign origin or merely entry. Our decision requires it to revamp those strategies and may well derail investigations or prosecutions already underway—even convictions already obtained. *See Bousley v. United States*, 523 U.S. 614, 619–21, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (holding *Teague v. Lane* nonretroactivity principles inapplicable to interpretation of substantive rules of criminal law).

Our holding also results in standards that vary from circuit to circuit. The government already faces this prospect from *Ramirez–Ferrer*, but we greatly exacerbate the problem. Our enormous circuit covers not only the entire west coast of the United States, but also Hawaii, Alaska, Guam and the Marianas. If *Ramirez–Ferrer* threw a wrench into the government's interdiction machine, we throw in the toolbox.

**2.** Now for the other side of the scale— the majority's conceit that it achieves greater fairness and consistency with its tortured interpretation. The majority laments that "a passenger who carries a bag of marijuana on a flight from Portland to Anchorage has committed the crime of importation, while a drug-carrying traveler who departs from the same terminal at the Portland airport is guilty only of mere possession ... if his flight lands in Phoenix rather than Anchorage." Maj. op. at 631. We are not dealing here with a statute that criminalizes otherwise innocent conduct; the difference in treatment is at best a sentencing disparity. Possession of illegal narcotics is already a serious of-

fense, and taking narcotics on a commercial airliner—where even the wrong pair of toenail clippers means serious trouble—is not only illegal but incredibly stupid. This may be a form of stupidity that strikes close to home—the criminals the majority purports to spare today are not the usual inner-city casualties of draconian drug laws, *cf. Bonin v. Calderon*, 59 F.3d 815, 851 & n. 2 (9th Cir.1995) (Kozinski, J., concurring), but interstate passengers on commercial flights who look a lot like our own sons and daughters coming home from college. The majority's concern for criminal defendants we can easily identify with is touching, but should we really be rewriting the nation's drug laws just because a group we happen to favor might be treated too harshly?

Any doubt that the majority misplaces its sympathy is erased by its reliance on—of all things—the rule of lenity. Maj. op. at 635. Of course, people should not be thrown in jail if they did not have fair warning that their conduct was illegal. *See United States v. Nguyen*, 73 F.3d 887, 891 (9th Cir.1995). But relying on the rule of lenity as a justification for overruling settled law makes little sense. After *Perez* and *Sugiyama*, the Cabaccangs couldn't possibly have believed that their conduct wasn't covered by section 952(a). Invoking the rule to exonerate conduct clearly illegal when committed isn't lenity; it's a windfall to convicted drug dealers.

Finally, by exempting only nonstop travel through international airspace, the majority resolves one inequity only to create several others. For example, the drug-packing college kid who flies from Portland to Juneau through international airspace now gets off easier than the one who takes a nonstop ferry through international waters. And the Cessna weaving in and out of international airspace on its way from Los Angeles to San Francisco is better off than the sailboat tacking in and out of U.S. waters. *Cf. Ramirez–Ferrer*, 82 F.3d at 1142. Why is this mode-of-transportation discrimination any less arbitrary than the one the majority finds so repugnant?

And that's just the start. The hemp-toting freshman who flies home directly from Seattle to Fairbanks is now treated more favorably than the one whose plane touches down briefly in Vancouver, even if the latter had the drugs in his suitcase, which was checked through to his destination. Surely there is no equitable difference between the two, yet under the majority's rationale, the latter is worse off than commercial drug dealers like the Cabaccangs. The wayward hiker who strays briefly into Canadian territory (perhaps overcome by one too many handfuls of special "trail mix") is a smuggler, *cf. id.* at 1136 n. 3, while the drug courier whose Cessna veers into international airspace to avoid a storm is not. None of these newly created distinctions is any more equitable than the one the majority purports to eliminate.

Even hard-core judicial policy-seekers should cringe at today's decision. For all their manhandling of statutory text and precedent, my colleagues only manage to replace one arbitrary distinction with many others.

3. This abortive attempt to redraft the statute teaches several lessons, the most important of which is that arbitrarily disparate treatment of closely situated individuals is all but inevitable. It may well be that there is no "articulable legislative purpose for punishing the transport of drugs on a domestic flight that passes through international airspace more severely than the identical conduct on a flight that travels entirely within United States airspace." Maj. op. at 631. But there is certainly an articulable purpose

for treating border-crossing with drugs *in general* more severely than mere possession. Seemingly arbitrary treatment in a particular case is not a valid reason to disregard a statute's terms; there is no free-floating "narrow tailoring" principle of statutory construction. If Congress enacts a prescription drug benefit for people over sixty-five, a sixty year old can't qualify even if he proves his unique health problems make him constructively five years older. And if Congress bans drunk driving in national parks, a motorist can't defend himself by showing that his superior skills made up for his inebriation. And if it imposes an age of majority requirement, we don't waive it for precocious seventeen year olds. All these distinctions may seem arbitrary on their particular facts, but they are all consistent with the text of the statutes and their underlying logic.

The majority's interpretive method is to ask whether a defendant poses a greater menace than some hypothetical person not covered by the statute and, if not, to conclude that the defendant must be exempt as well. There are obvious reasons we don't interpret statutes this way. Judges often disagree about what Congress's purposes are and how particular conduct implicates them. Two defendants may seem similarly situated to one judge but night and day to another. Once we discard the statute's text as the acid test of its coverage, we lose it as a justification for our authority. If the college student who flies to Anchorage gets a few more years than the one who flies to Phoenix and wants to know why, we can point to the text and say, "Because you entered the United States 'from a place outside thereof,' and Congress made that a more serious crime." But if the one who drives home gets a few more years than the one who flies, what can the majority possibly say to convince him he is not a victim of judicial caprice? That "from" means one thing for planes and something else for cars?

Our political system has mechanisms to deal with harsh applications of unambiguous statutes. The most obvious is prosecutorial discretion. Despite its sympathy for the plight of tourists caught with personal stashes on flights from Los Angeles to San Francisco, the majority can't point to a single instance where the government has prosecuted such an offense as importation. Nor can it identify a case where the government has applied the importation laws to any of its other extreme hypotheticals. (Ours, obviously, is not such a case—the Cabaccangs masterminded a massive drug distribution network.) *Ramirez–Ferrer* relied on the absence of such prosecutions as a justification for its artificially narrow interpretation. *See* 82 F.3d at 1141–42. But to me, this history shows the effectiveness of prosecutorial discretion as a mechanism for avoiding the inequities the majority fears. If prosecutors start charging such offenses as importation, public outcry may prompt Congress to rewrite the statute. But statutory amendment, like prosecutorial discretion, is a function reserved to another branch.

Seemingly arbitrary distinctions are an inevitable consequence of the rule of law. The costs of governing prospectively by the written word, however, are more bearable than those of a judiciary of retrospective equity-brokers. In its quest for the holy grail of fairness in the drug laws, the majority cuts a swath of destruction through statutory text and precedent, and makes the government's already hard job of policing our borders much more difficult. Because I view our role as the more limited one of applying statutes as written and leaving questions of fairness to the political—and politically accountable—

branches of government, I respectfully dissent.